COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Fitzpatrick, Judges Benton, Elder, Annunziata, Bumgardner, Frank,
           Humphreys, Clements, Felton and Kelsey
Argued at Richmond, Virginia


KARING BETHEL MEDLEY

                                                        OPINION BY
v.        Record No. 1576-02-1                  JUDGE ROBERT J. HUMPHREYS
                                                     SEPTEMBER 21, 2004
COMMONWEALTH OF VIRGINIA


UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF NORTHAMPTON COUNTY
Glen A. Tyler, Judge

        William P. Robinson, Jr., for appellant.  No brief on rehearing
        submitted for appellant.

        Paul C. Galanides, Assistant Attorney General (Jerry W. Kilgore,
        Attorney General, on brief), for appellee.


        This matter comes before the Court on a rehearing *en banc* from an unpublished panel

decision rendered December 9, 2003.  See Medley v. Commonwealth, 03 Vap UNP 1567021

(2003).  In that decision, a divided panel of this Court reversed Medley's convictions for

possession of cocaine with intent to distribute (in violation of Code § 18.2-248) and transporting

more than one ounce of cocaine into the Commonwealth with the intent to distribute (in violation

of Code § 18.2-248.01), finding that police officers failed to "scrupulously honor" Medley's

invocation of his Miranda rights and, therefore, that the trial court should have granted Medley's

motion to suppress evidence.

        By order dated January 13, 2004, we granted the Commonwealth's petition for a

rehearing *en banc*, stayed the mandate of that decision, and reinstated the appeal.  Upon

rehearing this case *en banc*, we affirm Medley's convictions.

## I. Background

On appeal of a denial of a motion to suppress, we consider the evidence presented below in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).

So viewed, the evidence presented during the hearing on Medley's motion to suppress the evidence established that on the afternoon of August 17, 2000, State Police Officer C.S. Wade and several other officers were assigned to monitor southbound traffic at the toll plaza of the Chesapeake Bay Bridge in Northampton County and to "intercept people smuggling guns and drugs . . . from the New York area . . . to the Tidewater area." While looking "for violations on the vehicles and . . . for any unusual responses or reactions as [occupants] approach[ed] the toll booth," Officer Wade observed a 1996 Pontiac Sunfire approach the booth. The car's license plate number had a prefix on it that Officer Wade was not "familiar with as being issued over here on this side of the water," so he "assumed that this vehicle was from across the bay." Officer Wade, who was standing near the toll booth where he could be seen by the driver, looked into the car and noticed that the driver's "eyes were bugged out," "[t]hey were great big and round." For that reason, Officer Wade asked one of his fellow officers, Trooper Hawkins, to check the car "when it came up in his lane of travel."

When Medley, the driver, stopped to pay the toll, Trooper Hawkins observed that the car had a "dark window tint" and that there was a "dangling object in the rear-view mirror." Trooper Hawkins advised Medley "that his window tint appeared to be too dark under Virginia law and [that] it was also a violation to have any objects hanging from the mirror that could obstruct your view." He then asked Medley to pull over so that he could "talk to him about those violations."

When Trooper Hawkins asked Medley for his driver's license and registration, Medley said he had no identification. After a female passenger indicated that the automobile was hers and gave Trooper Hawkins the registration, Trooper Hawkins walked Medley to his car so that he could "r[u]n him through DMV." While Trooper Hawkins and Medley waited for the report concerning Medley's driving status, Hawkins asked Medley "where he was coming from." Medley said he and his passenger intended to drive to New York from Norfolk, but they had had an argument and were returning to Norfolk. At some point, Trooper Hawkins learned that Medley's driver's license was suspended.

During that time, another officer, Special Agent Wendell, questioned Medley's female passenger about her travel. After talking with her, Wendell advised Hawkins as to their conversation, and the two officers determined that the stories "didn't match." Officer Wade, who had also spoken with Medley's passenger, then approached Trooper Hawkins's patrol car and advised that he was "going to run a K-9 on the vehicle." Medley's female passenger "became very excited, very nervous."

As Officer Wade guided the dog around the Pontiac, the dog alerted near a rear door. Based upon the alert, Officer Wade looked inside the car and found, behind the driver's seat, a black, semi-transparent plastic bag containing a cereal box. Inside the box, he found "approximately 250 grams of what [he] believed to be . . . cocaine."

At that point, Trooper Hawkins handcuffed Medley and left him alone in his patrol car. Special Agent Wendell handcuffed the passenger and read her the Miranda warnings. Wendell then, in conjunction with Officer Wade, questioned the passenger again about "her trip up north." The passenger stated: Medley promised her $200 for taking him to New York; she noticed Medley had about $2,500 in a roll of money during the trip; she left the car to go to the bathroom when they arrived in New York, while Medley was talking with "a bunch of people";

she and Medley then "rode around for awhile," but eventually drove back to the same place; she left the car again and bought a "juice and some gum"; they then "left and came straight back" to Virginia; she noticed the cereal box when they were driving through Delaware, and Medley told her "his people gave it to him and not to worry about it."

After speaking with Medley's passenger, Special Agent Wendell went to Trooper Hawkins's vehicle and read Medley his Miranda rights. When he asked Medley if he understood those rights, Medley replied that he did. Special Agent Wendell then asked Medley if he wished to waive his rights and talk with him. Medley responded that "he would talk to [Special Agent Wendell], but he didn't want to waive his rights." Special Agent Wendell testified that the following then occurred:

> For several minutes I continued to talk to Mr. Medley saying I read him his Miranda rights. I asked him which rights he wished — that he wanted to invoke, and he said he wanted all of his rights. I told him that I cannot talk to him because of the third right — you have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with — excuse me — with you during questioning; and at that time he stated, I want all my rights, but I still want to talk to you. I again explained to him, I cannot talk to you — and I overemphasized that I cannot talk to him at all without having his waiver of rights; and he said, I don't want to waive anything on this. I want this sheet to remain the same — and this would be the sheet that I marked yes and then no — but I will talk to you.

Special Agent Wendell testified that he then asked another officer, Sergeant Clark, to join him. Both officers "tried to explain over and over again to him that if he wishes to enact his Miranda rights, [they could not] talk to him." Medley responded that he understood his rights and said he "did not want to waive his rights, but . . . would talk to [them]." The officers then told Medley that if he wanted to speak with them, he would have to initiate the conversation. They then walked away from the patrol car and joined the other officers in searching the Pontiac.

A few moments later, Trooper Hawkins returned to his vehicle and read Medley his Miranda rights once again. Medley "wasn't talking at that point," and "he wouldn't say that he understood his rights." When Trooper Hawkins asked Medley if he wanted to waive his rights, Medley "[went] as far as acknowledging his understanding; but he would not say, I waive my rights." Trooper Hawkins then "determined, unless [Medley] approached [him] and wanted to talk to [him] again, [he] wasn't going to have any more conversation."

The record is silent as to what occurred immediately thereafter. However, within approximately thirty minutes after Special Agent Wendell had begun searching the Pontiac, Trooper Hawkins came to him and said, "[Medley] wants to talk to you." During the suppression hearing, Special Agent Wendell testified that the following then occurred:

> I then proceeded back to the vehicle and asked Mr. Medley, Do you want to talk to me? He said, Yes, I want to talk to you.
>
> I again explained to him, if you're not willing to waive your rights, I cannot talk to you. He said, I — quote and unquote — Mr. Medley stated that he could talk to me because she had nothing to do with the investigation. I then explained to Mr. Medley, I don't want to talk to you unless you're willing to waive your rights; and he said, I'll talk to you. I just don't want anything to be used against me. I'll talk to you off record, and I told him that he cannot talk to me off the record because he invoked his rights. Again, he consistently told me that he wanted to talk to me; and, therefore, I began talking to him.

Special Agent Wendell further testified that Medley responded to his "questioning" and said that his passenger knew nothing, that he was being paid $1,500 for taking "the item" to Norfolk, that another car was following them to Norfolk, and that he was to deliver the item to the occupants of the other car in Norfolk.

Medley, a convicted felon, testified that he told all the officers he did not want to waive his rights and denied telling them he wanted to talk to them. He testified that when he told them he would not make a statement, he gave them his lawyer's business card. Medley claimed one of

the officers ripped it while talking to him.  He testified that Trooper Hawkins "kept asking

questions" and talked for thirty to forty minutes about waiving his rights.  Medley denied making

any statements to Special Agent Wendell about going to New York or making a delivery to the

people in a car following him.

The trial judge denied Medley's motion to suppress, ruling as follows:

> I think he had a right to stop him, and . . . if you believe his
> testimony, he didn't make any statements.  So there is nothing to
> be suppressed.  If you believe the officers' testimony, he didn't
> waive his rights; but he initiated the conversation.  So I would
> overrule the motion.

Medley subsequently entered "conditional" pleas of guilty to the charges, purportedly based

upon North Carolina v. Alford, 400 U.S. 25 (1970).[1]  This appeal followed.

## II.  Analysis

We begin by recognizing the well-settled maxim that on an appeal of a ruling on a motion

to suppress, "we are bound by the trial court's findings of historical fact unless 'plainly wrong'

or without evidence to support them," McGee v. Commonwealth, 25 Va. App. 193, 198, 487

S.E.2d 259, 261 (1997) (*en banc*), but we review *de novo* the trial court's application of defined

legal standards such as probable cause and reasonable suspicion to the particular facts of the

case, Ornelas v. United States, 517 U.S. 690, 699 (1996).

We next note that in the appellant's brief Medley filed before the panel, the issue Medley

presented is whether, "[t]he trial court erred in dismissing appellant's motion to suppress the

evidence seized from the vehicle and appellant's incriminating statement, as the same were

seized in violation of the Fourth, Fifth and Fourteenth Amendments to the United States

Constitution."  However, in an apparent violation of Rule 5A:20(e), Medley's panel brief

_____

[1]  The Commonwealth conceded during oral argument that Medley entered his pleas of
guilty upon the condition that he maintain the right to appeal the trial court's denial of his motion
to suppress.  Thus, we assume without here deciding, that Medley properly preserved this appeal

contained no argument or authority suggesting any Fourth Amendment violation. We thus, have

no basis to consider the application of the Fourth Amendment further. See Rule 5A:20(e) ("The

opening brief of appellant shall contain . . . [t]he principles of law, the argument, and the

authorities relating to each question presented.").

Medley asserted during oral argument that the police conduct at issue here, violated his

"right not to incriminate himself as secured by the Fifth and Fourteenth Amendments."

Specifically, Medley has contended on appeal (at least implicitly) that police violated his right to

remain silent, as well as his right to counsel under Miranda v. Arizona, 384 U.S. 436 (1966).

Assuming, without here deciding, that Medley's broad and unfocused question presented was

sufficient to preserve both arguments, we find that the evidence below established police did not

violate Medley's "right not to incriminate himself as secured by the Fifth and Fourteenth

Amendments." Therefore, we affirm his convictions.

A.

We first address Medley's argument that police violated his Miranda right to counsel. An

issue of whether an accused "clearly requested an attorney during a custodial interrogation is a

mixed question of law and fact." Commonwealth v. Redmond, 264 Va. 321, 326, 568 S.E.2d

695, 697 (2002) (plurality opinion). "'[T]he determination of what [the accused] actually said is

a question of fact that we review only for clear error. . . . Whether those words are sufficient to

invoke the right to counsel is a legal determination that we review *de novo*.'" Id. at 327, 568

S.E.2d at 698 (quoting United States v. Uribe-Galindo, 990 F.2d 522, 523 (10th Cir. 1993) (other

citation omitted)).

In the appellate brief Medley filed before the panel, Medley cited *only* Edwards v.

Arizona, 451 U.S. 477 (1981), as authority in support of his position that police violated his

---

– despite the fact that the trial court's final order makes no mention of a conditional guilty plea.

rights "under the Fourth, Fifth and Fourteenth Amendments." In <u>Edwards</u> the United States Supreme Court recognized that:

> In <u>Miranda v. Arizona</u>, [384 U.S. 436 (1966)], the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney. 384 U.S., at 479. The Court also indicated the procedures to be followed subsequent to the warnings. If the accused indicates that he wishes to remain silent, "the interrogation must cease." If he requests counsel, "the interrogation must cease until an attorney is present." <u>Id.</u>, at 474.

451 U.S. at 481-82.

> In order to "prevent police from badgering a defendant into waiving his previously asserted <u>Miranda</u> rights" and to "protect the suspect's 'desire to deal with the police only through counsel,'" the United States Supreme Court established the "<u>Edwards</u> rule" as a "second layer of prophylaxis for the <u>Miranda</u> right to counsel." <u>See</u> <u>Davis</u> [v. United States, 512 U.S. 452, 458 (1994)]; <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 176, 178, 111 S. Ct. 2204, 2208, 2209, 115 L. Ed. 2d 158 (1991); <u>Michigan v. Harvey</u>, 494 U.S. 344, 350, 110 S. Ct. 1176, 1180, 108 L. Ed. 2d 293 (1990).

<u>Quinn v. Commonwealth</u>, 25 Va. App. 702, 710-11, 492 S.E.2d 470, 474-75 (1997).

Specifically, <u>Edwards</u> extended the principles set forth in <u>Miranda</u> "to subsequent interrogation, holding that, '. . . an accused, . . ., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." <u>Commonwealth v. Gregory</u>, 263 Va. 134, 146-47, 557 S.E.2d 715, 722 (2002) (quoting <u>Edwards</u>, 451 U.S. at 484-85). Thus, "[t]he prophylaxis of <u>Miranda</u> and <u>Edwards</u> *provides the right to have counsel* present during interrogation as an additional safeguard in the exercise of the right against self-incrimination." <u>Id.</u> at 147, 557 S.E.2d at 722 (emphasis added).

However, "[w]hether the Edwards rule renders a statement inadmissible is determined by a three-part inquiry." Quinn, 25 Va. App. at 712, 492 S.E.2d at 475. The first part of that inquiry calls for a determination of whether "'the accused *actually* invoked his right to counsel.'" Id. (quoting Tipton v. Commonwealth, 18 Va. App. 832, 834, 447 S.E.2d 539, 540 (1994)) (emphasis added). The evidence in the case at bar does not satisfy that first portion of the analysis.

The United States Supreme Court has "ruled that the test for determining whether the accused invoked the right to counsel is an objective one." McDaniel v. Commonwealth, 30 Va. App. 602, 605, 518 S.E.2d 851, 853 (1999) (citing Davis, 512 U.S. at 457-59). Thus, a court "must determine whether the accused 'articulate[d] his desire to have counsel present *sufficiently clearly* that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" Id. (quoting Davis, 512 U.S. at 459); see also Gregory, 263 Va. at 147, 557 S.E.2d at 723 ("The Edwards rule does not apply unless the prior interrogation was custodial and during that custodial interrogation, the suspect clearly and unequivocally invoked his right to counsel.").

Here it is clear, as the trial court found, that Medley indicated to police he did not wish to waive his "rights." Nevertheless, contrary to Medley's assertions, such a general refusal to waive his rights, standing alone, is hardly sufficient to convey to police a clear and unequivocal request for counsel. As the United States Supreme Court explained in Davis, "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" 512 U.S. at 459 (quoting McNeil, 501 U.S. at 178).

> [T]he suspect must unambiguously request counsel. As we have
> observed, "a statement either is such an assertion of the right to
> counsel or it is not." Smith v. Illinois, [469 U.S. 91, 97-98 (1984)]
> (brackets and internal quotation marks omitted). . . . Although a

suspect need not "speak with the discrimination of an Oxford don," . . . he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement *to be a request for an attorney*. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect. See Moran v. Burbine, [475 U.S. 412, 433 n.4] (1986) ("The interrogation must cease until an attorney is present *only* if the individual states that he wants an attorney") (citations and internal quotation marks omitted).

Id. (emphasis in original). In explanation of the underlying rationale, the Supreme Court stated:

In considering how a suspect must invoke the right to counsel, we must consider the other side of the Miranda equation: the need for effective law enforcement. Although the courts ensure compliance with the Miranda requirements through the exclusionary rule, it is police officers who must actually decide whether . . . they can question a suspect. The Edwards rule — questioning must cease if the suspect asks for a lawyer — provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that might be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong.

Id. at 461.

No clear request for an attorney can reasonably be found in Medley's broad statements pertaining to his "rights." See Eaton v. Commonwealth, 240 Va. 236, 252-53, 397 S.E.2d 385, 395-96 (1990) ("We share the U.S. Supreme Court's preference for 'bright-line' rules for the guidance of those who must conduct and evaluate custodial interrogations. In further explication . . . we hold that the Edwards rule is invoked, and that custodial interrogation must cease, when the accused, having received Miranda warnings and having begun to respond to the questions of the authorities, 'has *clearly* asserted his right to counsel'" (quoting Edwards, 451 U.S. at 485) (emphasis in original)). To the contrary, the most that one could reasonably glean from Medley's statements is that he did not wish to speak generally about the drugs found in the

car. See, e.g., Anderson v. Smith, 751 F.2d 96, 101 (2d Cir. 1984) (noting that where an accused "did not expressly ask for a lawyer," but indicated he did not wish to waive "these rights," after Miranda warnings were read to him, a court will assume "that all that he did was to assert his right to remain silent"); see also Edwards, 451 U.S. at 484 (noting a distinction between an invocation of the right to remain silent and the right to counsel stating, "additional safeguards are necessary when the accused *asks for counsel*" (emphasis added)). For these reasons, an Edwards analysis is not appropriate under the circumstances at issue in this case. It is thus clear that police did not violate Medley's Miranda right to counsel. Accordingly, we affirm his convictions on this basis.

B.

Turning to Medley's claim that police violated his Miranda right to silence, we note first Miranda recognized that if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74. As previously noted, our standard of review requires us to conduct a *de novo* review of the application of the protections afforded by Miranda to the historical facts as found by the trial court. Burket v. Commonwealth, 248 Va. 596, 611, 450 S.E.2d 124, 132 (1994) ("Whether a statement is voluntary is ultimately a legal rather than factual question. Subsidiary factual questions, however, are entitled to a presumption of correctness." (citations omitted)); Correll v. Thompson, 63 F.3d 1279, 1290 (4th Cir. 1995). Thus, the issue of whether Medley waived his rights under Miranda is a mixed question of law and fact, and while we are bound by the facts and reasonable inferences that flow from those facts as they relate to Medley's words and conduct, we are not bound by the legal conclusion of the trial court that Medley "didn't waive his rights." Id.

Assuming without here deciding that Medley's statements and conduct were initially sufficient to equate to a clear and unambiguous assertion of his right to remain silent, we find that the factual circumstances as found by the trial court plainly reveal that, subsequently, when Medley reinitiated contact with Special Agent Wendell and insisted on giving a statement relating to his passenger's involvement with the drugs, by his own actions, he knowingly, intelligently and voluntarily waived that right.

Indeed, it is well settled that even if invoked, the Miranda right to silence can "be waived by the suspect if the waiver is made knowingly and intelligently." Jackson v. Commonwealth, 266 Va. 423, 432, 587 S.E.2d 532, 540 (2003). In fact, in Michigan v. Mosley, 423 U.S. 96, 102 (1975), the United States Supreme Court expressly acknowledged that "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, *regardless of the circumstances*, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." (Emphasis added). Thus, while

> [a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, [it] is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; *but in at least some* cases *waiver can be clearly inferred from the actions and words of the person interrogated.*

North Carolina v. Butler, 441 U.S. 369, 373 (1979) (emphasis added).

Here, it is clear that police were initially confused as to whether Medley wished to invoke his right to silence. Indeed, after being read his Miranda rights, Medley told Special Agent

Wendell that he "would talk to [him], but that he didn't want to waive his rights." Special Agent Wendell then explained to Medley that he could not continue to talk to him, "because of the third right — you have the right to talk to a lawyer for advice before we ask you any questions." Medley responded, "I want all my rights, but I still want to talk to you." Medley stated, "I don't want to waive anything on this," but again stated, "I will talk to you." After several attempts to explain the Miranda rights to Medley, Medley continued to claim that he "did not want to waive his rights, but . . . would talk to [police]." In light of this, police consistently informed Medley that they could not continue to talk with him because they understood that he had invoked his rights under Miranda.

However, approximately thirty minutes after Special Agent Wendell left Medley to wait in the patrol car, Trooper Hawkins approached Wendell and stated, "[Medley] wants to talk to you." Special Agent Wendell testified that he went to the patrol car and:

> again explained to [Medley], if you're not willing to waive your rights, I cannot talk to you. He said, I — quote and unquote — Mr. Medley stated that he could talk to me because she had nothing to do with the investigation. I then explained to Medley, I don't want to talk to you unless you're willing to waive your rights; and he said, I'll talk to you. I just don't want anything to be used against me. I'll talk to you off record, and I told him that he cannot talk to me off the record because he invoked his rights. Again, he *consistently told me that he wanted to talk to me*; and, therefore, I began talking to him.

(Emphasis added). This course of conduct clearly and reasonably indicated to Special Agent Wendell that Medley understood his right to remain silent, understood the fact that "he [had] invoked his rights," but wished to waive his previously invoked right to remain silent and speak to police about his passenger's involvement with his activities.

Nevertheless, as indicated above, we recognize that:

> The inquiry into whether an individual waived effectuation of the rights conveyed in the Miranda warnings has two distinct dimensions. [Edwards, 451 U.S. at 482]. First, the relinquishment

of the right "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." [Moran, 475 U.S. at 421]. Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id.

United States v. Cristobal, 293 F.3d 134, 139-40 (4th Cir. 2002).

As to the first prong of the analysis - the voluntariness of Medley's ultimate waiver - the United States Supreme Court has held "the admissibility of statements obtained after [a] person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Mosley, 423 U.S. at 104. "A statement procured in violation of Mosley is presumed to have been obtained by an involuntary waiver of Fifth Amendment rights and, therefore, it is inadmissible." Pugliese v. Commonwealth, 16 Va. App. 82, 88, 428 S.E.2d 16, 21 (1993).

The question of "[w]hether a person's decision to remain silent has been 'scrupulously honored' requires an independent examination of the circumstances." Id. "This question is one of law subject to *de novo* review; however, the subsidiary factual findings of the [trial] court are entitled to a presumption of correctness." Correll, 63 F.3d at 1290 (citing Miller v. Fenton, 474 U.S. 104, 112 (1985)); see also Pugliese, 16 Va. App. at 88, 428 S.E.2d at 21 ("In making this determination, an appeals court is 'bound by the trial court's subsidiary factual findings unless those findings are plainly wrong.'" (quoting Wilson v. Commonwealth, 13 Va. App. 549, 551, 413 S.E.2d 655, 656 (1992)).

In so reviewing this issue, we must keep in mind that the United States Supreme Court, in Davis, advised that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether [the suspect] actually wants"

to invoke a specified right. Davis, 512 U.S. at 461. When viewed properly - in the light most favorable to the Commonwealth as the party prevailing below - the record establishes that the "good police practice" described in Davis, is all that took place here. Indeed, from the beginning of their interaction with Medley, the officers here reasonably believed, based upon Medley's course of conduct, that he was confused or ambivalent about whether to invoke his right to remain silent. Moreover, once Medley decided to invoke that right, the officers reasonably believed that he was confused or ambivalent about whether to waive the right. In fact, credible evidence in the record suggests that it was *only* because of Medley's consistently equivocal and contradictory conduct that police inquired further of Medley to determine whether he understood his rights and/or whether he intended to waive them.

Under these circumstances, we find no reason to conclude that the officers failed to "scrupulously honor" Medley's right to remain silent. Indeed, there was "nothing coercive or deceitful" in the officers' conduct toward Medley – particularly given Medley's consistently contradictory statements. See Land v. Commonwealth, 211 Va. 223, 229, 176 S.E.2d 586, 590 (1970). Furthermore, as his dialog with police officers makes clear, there is no question that Medley was aware of the nature of his right to remain silent and the potential consequences of abandoning that right.

Thus, by consistently reasserting his intent to communicate with police about the involvement of his passenger, and by ultimately doing so – despite the numerous warnings given to him by the officers involved – we find that the officers here reasonably believed, based upon the totality of Medley's conduct, that he knowingly, intelligently and voluntarily chose to waive any previously invoked right to remain silent. See Connecticut v. Barrett, 479 U.S. 523, 529 (1987) ("Miranda gives the defendant a right to choose between speech and silence, and [the defendant] chose to speak.").

For these reasons, we hold that the trial court did not err in denying Medley's motion to suppress on these grounds,[2] and we thus, affirm his convictions on this basis as well.

Affirmed.

---

[2] In light of this holding, we do not address the Commonwealth's alternative theory that any error on the part of the trial court was harmless, given the magnitude of the remaining evidence against Medley, as well as his pleas of guilty.

Benton, J., with whom Elder, J., joins, dissenting.

When a defendant files a motion to suppress a statement and alleges a Miranda violation, the Commonwealth bears the burden of proving that the defendant waived his Miranda rights. Tague v. Louisiana, 444 U.S. 469, 470 (1980) (per curiam) (citing Miranda v. Arizona, 384 U.S. 436, 475 (1966)). The evidence in this case is demonstrable that Karing Bethel Medley did not waive his Miranda rights and that the Commonwealth failed in its burden to prove he did. Indeed, when, as in this case, a trial judge finds that the defendant "didn't waive his rights," we are bound by that finding of historical fact unless it is "plainly wrong" or "without evidence to support [it]." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*). See also Chawla v. BurgerBusters, Inc., 255 Va. 616, 622-23, 499 S.E.2d 829, 833 (1998) (defining waiver); Stewart v. Commonwealth, 245 Va. 222, 231, 427 S.E.2d 394, 401 (1993) (holding that waiver is a question of fact). I therefore dissent.

I.

Medley unambiguously invoked his Miranda rights when police began interrogating him. Even after repeated police attempts, Medley refused to waive those rights.

The evidence proved that Medley was in custody in a police officer's vehicle and in handcuffs when Special Agent Wendell began interrogating him. After Special Agent Wendell read Miranda rights to Medley, he asked Medley if he understood those rights. Medley said he did. When Special Agent Wendell asked Medley if he wished to waive those rights and talk with him, Medley responded that "he would talk to [Special Agent Wendell], but he didn't want to waive his rights."

> Although the record does not contain the precise language . . .
> [used to convey] the Miranda rights, those rights typically are
> worded to inform an accused as follows:

MIRANDA WARNING

1. You have the right to remain silent.

2. Anything you say can and will be used against you in court.

3. You have the right to talk to a lawyer and have him present while you are being questioned.

4. If you cannot afford to hire a lawyer, one will be appointed to represent you, without cost, before any questioning, if you desire one.

McDaniel v. Commonwealth, 30 Va. App. 602, 606, 518 S.E.2d 851, 853 (1999) (*en banc*). See also Harrison v. Commonwealth, 244 Va. 576, 578, 423 S.E.2d 160, 161 (1992). When Special Agent Wendell continued to talk to Medley and "asked him which rights . . . he wanted to invoke," Medley "said he wanted all of his rights." Given this context in which the officer had just advised Medley of these four specific rights, nothing is ambiguous about Medley's response. He invoked each of the four rights as itemized.

Rather than accepting Medley's invocation of his "rights" and ceasing the interrogation, Special Agent Wendell continued to interrogate Medley. He testified that the following occurred:

> For several minutes I continued to talk to Mr. Medley saying I read him his Miranda rights. I asked him which rights he wished -- that he wanted to invoke, and he said he wanted all of his rights. I told him that I cannot talk to him because of the third right -- you have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with -- excuse me -- with you during questioning; and at that time he stated, I want all my rights, but I still want to talk to you. I again explained to him, I cannot talk to you -- and I overemphasized that I cannot talk to him at all without having his waiver of rights; and he said, I don't want to waive anything on this. I want this sheet to remain the same -- and this would be the sheet that I marked yes and then no -- but I will talk to you.

I acknowledge the Supreme Court's recognition that "good practice suggests that the police should attempt to clarify ambiguous statements," Midkiff v. Commonwealth, 250 Va. 262, 266, 462 S.E.2d 112, 115 (1995) (citing Davis v. United States, 512 U.S. 452, 460-61 (1994)), however, the facts in this case show that the encounters between Medley and the police went beyond mere clarification. Medley's statement that "he wanted all of his rights" was not ambiguous. Indeed, Special Agent Wendell specifically acknowledged at trial that he understood Medley invoked his right to an attorney and did not want to talk without a lawyer. Although he knew Medley had not waived his rights, he continued his efforts to elicit a waiver.

To assist in obtaining a waiver, Special Agent Wendell asked Sergeant Clark to join him and talk to Medley. He described their extensive efforts as follows:

> At that particular point in time after minutes and numerous times trying to explain about I cannot talk to him if he does not wish to waive them, I brought Sergeant Clark in. Sergeant Clark and I both tried to explain over and over again to him that if he wishes to enact his Miranda rights, I cannot talk to him; and at that time Sergeant Clark also advised him of that. From that standpoint, Sergeant Clark and I closed the door -- I closed the door myself; and Sergeant Clark advised him that if he wants to talk to us, he's going to have to initiate the conversation for us to continue to talk to him.

Sergeant Clark confirmed that, after he joined Special Agent Wendell and again explained the Miranda rights to Medley, Medley responded that he understood his rights and said he "did not want to waive his rights, but . . . would talk to us." Sergeant Clark testified that after trying three more times, he told Medley that Medley would have to initiate the conversation otherwise they would not talk to him anymore. Special Agent Wendell and Sergeant Clark then left Medley alone in the vehicle. At that point, both officers knew that Medley refused to waive his Miranda rights.

Special Agent Wendell joined the other officers who were searching the passenger's automobile, and he told Trooper Hawkins that Medley "didn't give a statement." Nevertheless,

after only a momentary cessation, Trooper Hawkins entered the vehicle and renewed the attempt to get a statement. Trooper Hawkins, the third officer to violate Medley's election to terminate questioning, began by repeating for at least the third time, the <u>Miranda</u> rights as follows:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one; and then I always go into the waiver. Do you understand each of these rights I've explained to you? And having these rights in mind, do you wish to talk to us now? He would never go into with me --
>
> Q: Don't paraphrase or describe. Tell me exactly what he said to you.
>
> A: I don't know verbatim how he responded to that; but I know it was to the point that he did not want to talk to me at that point, so I cut my conversation off then.
>
> Q: You understood then that Mr. Medley did not waive his Miranda rights?
>
> A: With me, he did not.

Trooper Hawkins further explained as follows:

> I sat back with Mr. Medley for a little while after his Miranda warnings were read to him. Special Agent Wendell had read them, and I had read them again, and he wasn't talking at that point when I was with him. He just said that everything -- when I read them to him, he would say -- he wouldn't say that he understood his rights. He wouldn't go that far with me.
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> When I talked to him, he -- he wouldn't -- when I asked him the question about will you waive your rights, he would never say I waive my rights. He would go as far as acknowledging his understanding; but he would not say, I waive my rights.

He testified that he then "determined, unless [Medley] approached [him] and wanted to talk to [him] again, [he] wasn't going to have any more conversation."

Special Agent Wendell testified that, within a half an hour of his departure from seeking a statement from Medley, Trooper Hawkins came to him and said, "he wants to talk to you." The record contains no testimony from Trooper Hawkins about the circumstances which gave rise to the conversation with Medley and which led Trooper Hawkins to seek out Special Agent Wendell. The record clearly establishes, however, that when Special Agent Wendell returned to the vehicle to re-interrogate Medley, less than a half hour had lapsed from his initial efforts. Thus, during a half-hour period Medley had been given at least three sets of Miranda warnings and subjected to interrogation by Trooper Hawkins, Sergeant Clark, and twice by Special Agent Wendell. At no time did Medley say he was waiving his Miranda rights. Indeed, Medley said at all times and on each reading of his Miranda rights that he would not waive his rights.

Special Agent Wendell testified that the following occurred.

> I then proceeded back to the vehicle and asked Mr. Medley, Do you want to talk to me? He said, Yes, I want to talk to you.
>
> I again explained to him, if you're not willing to waive your rights, I cannot talk to you. He said, I -- quote and unquote -- Mr. Medley stated that he could talk to me because [the passenger] had nothing to do with the investigation. I then explained to Mr. Medley, I don't want to talk to you unless you're willing to waive your rights; and he said, I'll talk to you. I just don't want anything to be used against me. I'll talk to you off record, and I told him that he cannot talk to me off the record because he invoked his rights. Again, he consistently told me that he wanted to talk to me; and, therefore, I began talking to him.

Denying Medley's motion to suppress his statements, the trial judge made the following ruling:

> I think [the officers] had a right to stop him, and . . . if you believe [Medley's] testimony, he didn't make any statements. So there is nothing to be suppressed. If you believe the officer's testimony, he didn't waive his rights; but he initiated the conversation. So I would overrule the motion.

II.

I would hold that the Commonwealth failed to prove Medley waived his Miranda rights.

I would further hold that the conduct of the officers violated both Medley's right to remain silent

and his right to have the questioning ceased until he had consulted an attorney.

The majority is correct that Medley never specifically mentioned his "right to counsel."

Special Agent Wendell did testify, however, that he told Medley he could "not talk to him

because of the third right -- you have the right to talk to a lawyer for advice before we ask you

any questions and to have a lawyer with . . . you during questioning."  Special Agent Wendell

also testified that Medley responded to that comment by saying, "I want all my rights."

Therefore, Special Agent Wendell, who was the first officer to read Miranda rights to Medley,

was aware that Medley did not want to waive his right to talk to his attorney before being

interrogated.  In view of this circumstance, Special Agent Wendell and any other reasonably

trained officer certainly "'would understand the statement to be a request for an attorney.'"

McDaniel, 30 Va. App. at 605, 518 S.E.2d at 853 (citation omitted).  The record further reflects

that after Sergeant Clark and Trooper Hawkins read Miranda rights to Medley, Special Agent

Wendell returned to the vehicle and again questioned Medley.  He was fully aware of Medley's

earlier refusal to waive his right to an attorney, and he initiated the interrogation with full

knowledge that the other two officers had conversed with Medley and were unsuccessful in their

attempts to obtain Medley's waiver.

> The prosecution may not use statements, whether exculpatory
> or inculpatory, stemming from custodial interrogation of the
> defendant unless it demonstrates . . . [that] the waiver [of the right]
> is made voluntarily, knowingly and intelligently.  *If . . . he
> indicates in any manner and at any stage of the process that he
> wishes to consult with an attorney before speaking there can be no
> questioning*.  Likewise, if the individual is alone and indicates in
> any manner that he does not wish to be interrogated, the police
> may not question him.  The mere fact that he may have answered

some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

Miranda, 384 U.S. at 444-45 (emphasis added).  The violation in this case is patent.

### III.

The trial judge's assertion that Medley "initiated the conversation" ignores the evidence which shows that the police failed to "scrupulously honor" Medley's request to remain silent and his repeated assertion that "he wanted all his rights."  Noting that Edwards v. Arizona, 451 U.S. 477 (1981), has been misapprehended, the Supreme Court of the United States explained its ruling as follows:

> We did not there hold that the "initiation" of a conversation by a defendant such as respondent would amount to a waiver of a previously invoked right to counsel; we held that after the right to counsel had been asserted by an accused, further interrogation of the accused should not take place "unless the accused himself initiates further communication, exchanges, or conversations with the police."  451 U.S., at 485.  This was in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in Edwards was. . . .
>
> But even if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation. . . .
>
> *        *        *        *        *        *        *
>
> Thus, the . . . Court of Appeals was wrong in thinking that an "initiation" of a conversation or discussion by an accused not only satisfied the Edwards rule, but *ex proprio vigore* sufficed to show a waiver of the previously asserted right to counsel.  The inquiries are separate, and clarity of application is not gained by melding them together.

Oregon v. Bradshaw, 462 U.S. 1039, 1044-45 (1983) (citations omitted).

Medley argued on brief, as he did at trial, that the trial judge must determine: "First . . . whether the accused unequivocally invoked his right to counsel. Second, . . . whether the accused rather than the authorities initiated further discussions . . . . Third, if the accused did initiate further discussions . . . [,] whether the accused knowingly and intelligently waived the previously invoked right to counsel." He argues, and the Supreme Court has held, the Fifth Amendment right against self-incrimination protects an accused as follows:

> "Once [Miranda] warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his *Fifth Amendment* privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U.S. at 473-74.
>
>       *     *     *     *     *     *     *
>
> A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . ." 384 U.S. at 479. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." Id. at 474. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his "right to cut off questioning" was "scrupulously honored."

Michigan v. Mosley, 423 U.S. 96, 100-04 (1975) (footnotes omitted).

The evidence clearly establishes that the officers made repeated efforts to elicit a waiver after Medley said he understood his rights and did not want to waive any of them. In addition,

no evidence proved that Medley initiated contact, communication, or exchange with Sergeant Clark or Trooper Hawkins. Special Agent Wendell brought Sergeant Clark to question Medley even after Medley said he would not waive his rights. Trooper Hawkins testified that he initiated his exchange with Medley after Special Agent Wendell said Medley "didn't give a statement." Indeed, all of the officers testified that Medley communicated to them that he did not wish to waive his rights. Each officer who questioned him within that half-hour period also knew Medley previously had received Miranda warnings. Thus, the record clearly established that Medley's right to not be further questioned was not "scrupulously honored." Mosley, 423 U.S. at 104. This pattern of repeating Miranda warnings to Medley and then questioning him about his intent represents a "continuation of custodial interrogation after a momentary cessation," which the Supreme Court has recognized as conduct that "would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned." Mosley, 423 U.S. at 102.

Although the evidence does not prove Medley initiated the conversation with the officers, even if he had the Supreme Court has held that such an initiation does not act as a waiver. Bradshaw, 462 U.S. at 1044-45. The trial judge was in error when he assumed that it did because Bradshaw requires a two-pronged analysis. Once the trial judge found that Medley initiated conversation, he then was required to determine if Medley knowingly and voluntarily waived his Miranda rights. There was no such showing.

Moreover, even if Medley implicitly waived his Miranda rights by talking with police, demonstrating such an "implied waiver" is a much harder standard for the Commonwealth to meet. An implied waiver requires a "*clear and unmistakable proof* of the intention to waive such right, for the essence of waiver is voluntary choice." Chawla, 255 Va. at 623, 499 S.E.2d at 833 (emphasis added). This higher standard to show an implied waiver is in keeping with the

<u>Edwards</u> prophylactic function: to keep police from badgering a suspect once he has invoked his rights. As the United States Supreme Court has emphasized, once an accused has '"expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism.'" <u>Arizona v. Roberson</u>, 486 U.S. 675, 681 (1988) (quoting <u>Mosley</u>, 423 U.S. at 110, n.2).

Finding a confession inadmissible, the Supreme Court recently reiterated the explanation it gave in <u>Miranda</u>, "that the 'voluntariness doctrine . . . encompasses all interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice.'" <u>Missouri v. Seibert</u>, 124 S. Ct. 2601, 2607 (2004) (quoting <u>Miranda</u>, 384 U.S. at 464-65). The Court noted that "it would be absurd to think that mere recitation of the [warning] litany suffices to satisfy <u>Miranda</u> in every conceivable circumstance," <u>id.</u> at 2610, and the Court warned against approving a "police strategy adapted to undermine the <u>Miranda</u> warnings." <u>Id.</u> at 2612. As the Court noted in <u>Seibert</u>, some officers are now trained "to continue questioning after the suspect invokes his rights." <u>Id.</u> at 2609 n.2.

> This training is reflected in the reported cases involving deliberate questioning after invocation of <u>Miranda</u> rights. <u>See</u>, <u>e.g.</u>, <u>California Attorneys for Criminal Justice v. Butts</u>, 195 F.3d 1039, 1042-1044 (CA9 2000); <u>Henry v. Kernan</u>, 197 F.3d 1021, 1026 (CA9 1999); <u>People v. Neal</u>, 31 Cal. 4th 63, 68, 72 P.3d 280, 282 (2003); <u>People v. Peevy</u>, 17 Cal. 4th 1184, 1189, 953 P.2d 1212, 1215 (1998). Scholars have noted the growing trend of such practices. <u>See</u>, <u>e.g.</u>, Leo, Questioning the Relevance of <u>Miranda</u> in the Twenty-First Century, 99 Mich. L. Rev. 1000, 1010 (2001); Weisselberg, In the Stationhouse After <u>Dickerson</u>, 99 Mich. L. Rev. 1121, 1123-1154 (2001).

<u>Id.</u>

This case presents just another example of an interrogation strategy designed to undermine <u>Miranda</u>. Simply put, the officers in this case sought by their repeated approaches to

undermine Medley's resolve not to waive his <u>Miranda</u> rights after he declared that "he wanted all of his rights."  Within less than a half hour, three officers "persisted in repeated efforts to wear down [Medley's] resistance and make him change his mind."  <u>Mosley</u>, 423 U.S. at 105-06.  In view of Medley's express intention to exercise his Fifth Amendment privilege, the statement taken from him after officers questioned him on four occasions within a half hour "cannot be other than the product of compulsion, subtle or otherwise."  <u>Miranda</u>, 384 U.S. at 474.  In view of the Supreme Court's warning in <u>Miranda</u> "that 'illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure,'" 384 U.S. at 459 (quoting <u>Boyd v. United States</u>, 116 U.S. 616, 635 (1886)), I would hold that the persistent questioning on four occasions within a half hour by officers who read <u>Miranda</u> rights to Medley on at least three of those occasions demonstrated that Medley's refusal to waive his rights was not "scrupulously honored."

IV.

For these reasons, I would hold that the trial judge erred in denying the motion to suppress Medley's statements and I would reverse the convictions and remand for a new trial.

Tuesday                    13th

January, 2004.


Karing Bethel Medley,                                                        Appellant,

 against              Record No. 1576-02-1
                     Circuit Court Nos. CR00000145-00 and CR00000145-01

Commonwealth of Virginia,                                                    Appellee.


Upon a Petition for Rehearing En Banc

Before Chief Judge Fitzpatrick, Judges Benton, Elder, Annunziata, Bumgardner,
Frank, Humphreys, Clements, Felton and Kelsey


On December 23, 2003 came the appellee, by the Attorney General of Virginia, and filed
a petition praying that the Court set aside the judgment rendered herein on December 9, 2003,
and grant a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate
entered herein on December 9, 2003 is stayed pending the decision of the Court *en banc*, and the
appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellee shall attach as
an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously
rendered by the Court in this matter. It is further ordered that the appellee shall file with the clerk
of this Court twelve additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Humphreys and Senior Judge Hodges
Argued at Chesapeake, Virginia


KARING BETHEL MEDLEY

                                              MEMORANDUM OPINION[*] BY
v.        Record No. 1576-02-1             JUDGE JAMES W. BENTON, JR.
                                                DECEMBER 9, 2003
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF NORTHAMPTON COUNTY
Glen A. Tyler, Judge

William P. Robinson, Jr. (Robinson, Neeley & Anderson, on brief),
for appellant.

Paul C. Galanides, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


Pursuant to Code § 19.2-254 and <u>Alford v. North Carolina</u>, 400 U.S. 25 (1970), Karing

Bethel Medley conditionally pled guilty to the charges of possession of cocaine with the intent to

distribute and of transporting one ounce or more of cocaine into the Commonwealth with the intent

to distribute.  On appeal, he contends the trial judge erred in denying his motion to suppress

statements he made to the state police.  Based on the trial judge's finding that Medley did not waive

his rights, we reverse the convictions.

I.

At the suppression hearing, State Police Officer Wade testified that he and other officers

were assigned to monitor southbound traffic at the toll plaza of the Chesapeake Bay Bridge in

Northampton County and to "intercept people smuggling guns and drugs . . . from the New York

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

area . . . to the Tidewater area." While looking "for violations on the vehicles and . . . for any unusual responses or reactions [by the occupants] as they approach[ed] the toll booth," Officer Wade noticed the lettering on a license plate of an automobile approaching the toll booth. Based upon his knowledge that "certain letters are issued from the Eastern Shore area" for Virginia license plates, Officer Wade "assumed that this vehicle was from across the bay." He testified that he watched the driver approach the toll plaza where the officers stood and noticed that the driver's "eyes . . . were great big and round." He testified that these factors caused him to ask Trooper Hawkins to check the automobile.

When Medley, the driver, stopped to pay the toll, Trooper Hawkins told him "that his window tint appeared to be too dark under Virginia law and [that] it was also a violation to have any objects hanging from the mirror that could obstruct your view." Trooper Hawkins then directed Medley to stop his automobile at the side of the highway. When he asked for Medley's driver's license and registration, Medley said he had no identification. After the passenger indicated that the automobile was hers and gave Trooper Hawkins the registration, Trooper Hawkins walked Medley to his vehicle and contacted the dispatcher. While Trooper Hawkins and Medley waited for the report concerning Medley's driving status, Trooper Hawkins asked Medley about his travel destination. Medley said he and the passenger had intended to drive to New York from Norfolk, but they had an argument and were returning to Norfolk.

Special Agent Wendell questioned the passenger about her travel. After talking with her, Special Agent Wendell went to Trooper Hawkins, who was still sitting in his vehicle with Medley, and told him about his conversation with the passenger. Trooper Hawkins testified that he and Special Agent Wendell determined that the passenger's and Medley's replies were inconsistent. Officer Wade also talked to the passenger and told Trooper Hawkins her version of their travel, which contradicted Medley's version.

Officer Wade testified that he explained to the passenger that they intended to use a drug detection dog around the outside of her automobile because of her nervous actions and the inconsistent statements made by her and Medley. As Officer Wade guided the dog around the automobile, the dog alerted near a rear door. Based upon the alert, Officer Wade looked in the automobile and found, behind the driver's seat, a black plastic bag containing a box of cereal. Inside the box, he found "approximately 250 grams of what [he] believed to be . . . cocaine." Trooper Hawkins handcuffed Medley, and Special Agent Wendell handcuffed the passenger. Over Medley's objection, Officer Wade testified about the following statements the passenger made: that Medley promised her $200 for taking him to New York, that she noticed Medley had about $2,500 in a roll of money, that she left the automobile to go to the bathroom in New York while Medley was talking with some people, that she noticed the cereal box when they were driving through Delaware, and that Medley told her "his people gave it to him and not to worry about it."

Officer Wade also testified that neither Medley nor the passenger was charged with any violations concerning the tinted window or the object on the rearview mirror. He further testified as follows:

> Q: So this was nothing more than a pretextual stop, was it?
>
> A: As far as I'm concerned, you're correct. Yes, sir.

After Trooper Hawkins put handcuffs on Medley, he left Medley in his vehicle and went to the automobile that was being searched. Special Agent Wendell went to Trooper Hawkins's vehicle and read Medley his Miranda rights. Special Agent Wendell testified he asked Medley if he understood those rights. Medley said he did. When Special Agent Wendell asked Medley if he wished to waive his rights and talk with him, Medley responded that "he would talk to [Special Agent Wendell], but he didn't want to waive his rights." Special Agent Wendell testified that the following then occurred:

- 31 -

> For several minutes I continued to talk to Mr. Medley saying I read him his <u>Miranda</u> rights. I asked him which rights he wished -- that he wanted to invoke, and he said he wanted all of his rights. I told him that I cannot talk to him because of the third right -- you have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with -- excuse me -- with you during questioning; and at that time he stated, I want all my rights, but I still want to talk to you. I again explained to him, I cannot talk to you -- and I overemphasized that I cannot talk to him at all without having his waiver of rights; and he said, I don't want to waive anything on this. I want this sheet to remain the same -- and this would be the sheet that I marked yes and then no -- but I will talk to you.

Special Agent Wendell testified that he then asked Sergeant Clark to join him and talk to Medley.

> At that particular point in time after minutes and numerous times trying to explain about I cannot talk to him if he does not wish to waive them, I brought Sergeant Clark in. Sergeant Clark and I both tried to explain over and over again to him that if he wishes to enact his <u>Miranda</u> rights, I cannot talk to him; and at that time Sergeant Clark also advised him of that. From that standpoint, Sergeant Clark and I closed the door -- I closed the door myself; and Sergeant Clark advised him that if he wants to talk to us, he's going to have to initiate the conversation for us to continue to talk to him.

Sergeant Clark confirmed that after he joined Special Agent Wendell and again explained the <u>Miranda</u> rights to Medley, Medley responded that he understood his rights and said he "did not want to waive his rights, but . . . would talk to us." Sergeant Clark testified that after trying three more times, he told Medley that Medley would have to initiate the conversation otherwise they would not talk to him anymore. Special Agent Wendell and Sergeant Clark then left Medley alone in the vehicle. Special Agent Wendell joined the other officers who were searching the passenger's automobile.

Trooper Hawkins testified that Special Agent Wendell told him Medley did not give a statement. Trooper Hawkins testified that he then returned to his vehicle and read <u>Miranda</u> rights to Medley again. He explained those events as follows:

- 32 -

> I sat back with Mr. Medley for a little while after his <u>Miranda</u> warnings were read to him. Special Agent Wendell had read them, and I had read them again, and he wasn't talking at that point when I was with him. He just said that everything -- when I read them to him, he would say -- he wouldn't say that he understood his rights. He wouldn't go that far with me.

> \* \* \* \* \* \* \*

> When I talked to him, he -- he wouldn't -- when I asked him the question about will you waive your rights, he would never say I waive my rights. He would go as far as acknowledging his understanding; but he would not say, I waive my rights.

Trooper Hawkins testified that he then "determined, unless [Medley] approached [him] and wanted to talk to [him] again, [he] wasn't going to have any more conversation."

Special Agent Wendell testified that within a half an hour after he began searching the automobile, Trooper Hawkins came to him and said, "he wants to talk to you." Special Agent Wendell testified that the following occurred.

> I then proceeded back to the vehicle and asked Mr. Medley, Do you want to talk to me? He said, Yes, I want to talk to you.

> I again explained to him, if you're not willing to waive your rights, I cannot talk to you. He said, I -- quote and unquote -- Mr. Medley stated that he could talk to me because she had nothing to do with the investigation. I then explained to Mr. Medley, I don't want to talk to you unless you're willing to waive your rights; and he said, I'll talk to you. I just don't want anything to be used against me. I'll talk to you off record, and I told him that he cannot talk to me off the record because he invoked his rights. Again, he consistently told me that he wanted to talk to me; and, therefore, I began talking to him.

Special Agent Wendell testified Medley responded to his questioning and said that the passenger knew nothing, that he was being paid $1,500 for taking "the item" to Norfolk, that another car was following them to Norfolk, and that he was to deliver the item to the occupants of the other car in Norfolk.

Medley, a convicted felon, testified that he told all the officers he did not want to waive his rights and denied telling them he wanted to talk to them. He testified that when he told them

he was not making statements, he gave them his lawyer's business card. He said one of the officers ripped it while talking to him. He testified that Trooper Hawkins "kept asking questions" and talked for thirty to forty minutes about waiving his rights. Medley further denied making any statements to Special Agent Wendell about going to New York or making a delivery to the people in a car following him.

The trial judge denied the motion to suppress, ruling as follows:

> I think he had a right to stop him, and . . . if you believe his testimony, he didn't make any statements. So there is nothing to be suppressed. If you believe the officers' testimony, he didn't waive his rights; but he initiated the conversation. So I would overrule the motion.

This appeal challenges this ruling.

## II.

At trial, Medley's attorney argued that Medley "did not waive his Miranda rights and that any statement attributed to him would, therefore, be inadmissible." At trial and on appeal Medley cited Edwards v. Arizona, 451 U.S. 477 (1981), as authority supporting his position. The Commonwealth contends Edwards is inapplicable because Medley never invoked his right to counsel.

The United States Supreme Court held as follows in Edwards:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, . . . , having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484-85. "The Edwards rule does not apply unless the prior interrogation was custodial and during that custodial interrogation, the suspect clearly and unequivocally invoked

- 34 -

his right to counsel." Commonwealth v. Gregory, 263 Va. 134, 147, 557 S.E.2d 715, 723 (2002).

The record establishes that Medley was in custody and consistently indicated he did not waive his rights on each occasion when the officers read Miranda rights to him. Although Medley testified that he gave one of the officers his lawyer's card, Special Agent Wendell denied that Medley did so. The trial judge believed the officer's testimony.

The Commonwealth correctly notes that no officer testified that Medley specifically mentioned his "right to counsel." Special Agent Wendell did testify, however, that he told Medley he could not "talk to him because of the third right -- you have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with . . . you during questioning." Special Agent Wendell also testified that Medley responded to that comment by saying, "I want all my rights." Therefore, Special Agent Wendell, who was the first officer to read Miranda rights to Medley, was aware that Medley did not waive his right to talk to his attorney before being interrogated. In view of this circumstance, Special Agent Wendell certainly "'would understand the statement to be a request for an attorney.'" McDaniel v. Commonwealth, 30 Va. App. 602, 605, 518 S.E.2d 851, 853 (1999) (citation omitted). The record further reflects that after Trooper Hawkins and Sergeant Clark read Miranda rights to Medley, Special Agent Wendell returned to the vehicle and again questioned Medley. He was fully aware of Medley's earlier refusal to waive his right to an attorney, and he initiated the interrogation with full knowledge that the other two officers had conversed with Medley.

Because Medley never specifically mentioned "his right to counsel," Gregory, 263 Va. at 147, 557 S.E.2d at 723, and because Medley generally indicated he was not waiving any of his rights, we believe the following extended excerpt from Michigan v. Mosley, 423 U.S. 96, 100-04 (1975), guides our resolution of this issue:

Resolution of the question turns almost entirely on the interpretation of a single passage in the <u>Miranda</u> [<u>v. Arizona</u>, 384 U.S. 436 (1966),] opinion . . . :

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U.S., at 473-474.

> This passage states that "the interrogation must cease" when the person in custody indicates that "he wishes to remain silent." It does not state under what circumstances, if any, a resumption of questioning is permissible. The passage could be literally read to mean that a person who has invoked his "right to silence" can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize "any statement taken after the person invokes his privilege" as "the product of compulsion" and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite.

> It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of <u>Miranda</u> by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the <u>Miranda</u> safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the <u>Miranda</u> opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

A reasonable and faithful interpretation of the <u>Miranda</u> opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored. . . ." 384 U.S., at 479. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." <u>Id.</u>, at 474. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under <u>Miranda</u> on whether his "right to cut off questioning" was "scrupulously honored."

(Footnotes omitted).

The evidence proved that Medley was in custody in the officer's vehicle and in handcuffs when Special Agent Wendell interrogated him. After Special Agent Wendell read <u>Miranda</u> rights to Medley, Medley told him "he didn't want to waive his rights." When Special Agent Wendell continued to talk to Medley and "asked him which rights . . . he wanted to invoke," Medley "said he wanted all of his rights." Rather than accepting Medley's invocation of his "rights" and ceasing the interrogation, Special Agent Wendell brought Sergeant Clark to assist him. They both talked to Medley extensively but Medley refused to waive his rights. When they left Medley alone in the vehicle, both were aware that Medley expressed his wish not to waive his <u>Miranda</u> rights.

Special Agent Wendell told Trooper Hawkins that Medley "didn't give a statement." Nevertheless, after only a momentary cessation, Trooper Hawkins entered the vehicle, read <u>Miranda</u> rights again to Medley, and renewed the attempt to get a statement. Thus, Trooper Hawkins violated Medley's option to terminate questioning. He began by repeating for at least the third time, the <u>Miranda</u> rights.

A: You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one; and then I always go into the waiver. Do you understand each of these rights I've explained to you? And having these rights in mind, do you wish to talk to us now? He would never go into with me --

Q: Don't paraphrase or describe. Tell me exactly what he said to you.

A: I don't know verbatim how he responded to that; but I know it was to the point that he did not want to talk to me at that point, so I cut my conversation off then.

Q: You understood then that Mr. Medley did not waive his Miranda rights?

A: With me, he did not.

Special Agent Wendell testified that within a half hour of his departure from seeking a statement from Medley, Trooper Hawkins said Medley wanted to speak to Special Agent Wendell. The record contains no testimony from Trooper Hawkins about the circumstances giving rise to the conversation with Medley that led him to seek Special Agent Wendell. The record clearly establishes, however, that when Special Agent Wendell returned to the vehicle to re-interrogate Medley, less than a half hour had lapsed from his initial efforts. Thus, during a half-hour period Medley had been given at least three sets of Miranda warnings and subject to interrogation by Trooper Hawkins, Sergeant Clark, and twice by Special Agent Wendell. At no time did Medley say he was waiving his Miranda rights. Indeed, he said at all times and on each reading of Miranda that he would not waive his rights.

The evidence supports the trial judge's finding that Medley "didn't waive his rights." The Fifth Amendment right against self-incrimination protects an accused as follows:

[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates . . . [that] the waiver [of the right]

- 38 -

> is made voluntarily, knowingly and intelligently. If . . . he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

Miranda, 384 U.S. at 444-45.

The evidence clearly establishes that the officers made repeated efforts to elicit a waiver after Medley said he understood his rights and did not want to waive any of them. In addition, no evidence proved that Medley initiated contact, communication, or exchange with Sergeant Clark or Trooper Hawkins. Special Agent Wendell brought in Sergeant Clark even after Medley said he would not waive his rights. Trooper Hawkins testified that he initiated his exchange with Medley after Special Agent Wendell said Medley "didn't give a statement." The pattern of repeating Miranda warnings to Medley and then questioning him about his intent represents a "continuation of custodial interrogation after a momentary cessation," which the Supreme Court has recognized as conduct that "would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned." Mosley, 423 U.S. at 102. All of the officers testified that Medley communicated to them that he did not wish to waive his rights. Each officer who questioned him within that half-hour period also knew Medley previously had received Miranda warnings. Thus, the record clearly established that Medley's right to not be further questioned was not "scrupulously honored." Mosley, 423 U.S. at 104.

Simply put, the officers sought by their repeated approaches to undermine Medley's resolve not to waive his Miranda rights. Within less than a half hour, four officers "persist[ed] in repeated efforts to wear down [Medley's] resistance and make him change his mind." Mosley,

423 U.S. at 105-06.  In view of Medley's express intention to exercise his Fifth Amendment privilege, the statement taken from him after officers questioned him on four occasions within a half hour "cannot be other than the product of compulsion, subtle or otherwise."  Miranda, 384 U.S. at 474.  Noting the Supreme Court's warning in Miranda "that 'illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure.'"  384 U.S. at 459 (quoting Boyd v. United States, 116 U.S. 616, 635 (1886)), we hold that the persistent questioning on four occasions within a half hour by officers who read Miranda rights to Medley on at least three of those occasions demonstrated that Medley's refusal to waive his rights was not "scrupulously honored."  Accordingly, we reverse the order denying the motion to suppress Medley's statements, and we remand for a new trial if the Commonwealth be so advised.

Reversed and remanded.

Humphreys, J., concurring.

I concur with the majority in the judgment, but write separately because I do not believe the record in this case demonstrates that the officers failed to "scrupulously honor[]" Medley's refusal to waive his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). See Michigan v. Mosley, 423 U.S. 96, 100-04 (1975). I also disagree with the majority's implicit suggestion that Medley affirmatively invoked his right to an attorney.

Miranda recognized that if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74. As the majority recognizes, the United States Supreme Court has held that "the admissibility of statements obtained after [a] person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Mosley, 423 U.S. at 104. However, the Supreme Court of Virginia has recognized that "Miranda should not be read so strictly as to require the police to accept as conclusive any statement, no matter how ambiguous, as a sign that the suspect desires to cut off questioning." Lamb v. Commonwealth, 217 Va. 307, 312, 227 S.E.2d 737, 741 (1976); Midkiff v. Commonwealth, 250 Va. 262, 267, 462 S.E.2d 112, 115 (1995). Indeed, in Mosley, the Court acknowledged that "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, *regardless of the circumstances*, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." Mosley, 423 U.S. at 102 (emphasis added). Thus, while

> [a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, [it] is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was

- 41 -

unequivocally said in <u>Miranda</u>, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; *but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.*

<u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979) (emphasis added).

Here, after being read his <u>Miranda</u> rights, Medley told Special Agent Wendell that he "would talk to [him], but that he didn't want to waive his rights." Special Agent Wendell then explained to Medley that he could not continue to talk to him, "because of the third right – you have the right to talk to a lawyer for advice before we ask you any questions." Medley responded, "I want all my rights, but I still want to talk to you." Medley stated, "I don't want to waive anything on this," but again stated "I will talk to you." After several attempts to explain the <u>Miranda</u> rights to Medley, Medley continued to claim that he "did not want to waive his rights, but . . . would talk to [police]." Each time, police informed Medley that they could not continue to talk with him because he had invoked his rights under <u>Miranda</u>.

Approximately thirty minutes later, Trooper Hawkins approached Special Agent Wendell and stated, "[Medley] wants to talk to you." Special Agent Wendell testified that he again explained to Medley that he could not talk with him if he was "not willing to waive [his] rights." Medley responded that "he could talk to [Wendell] because [the passenger] had nothing to do with the investigation." Medley stated, "I'll talk to you. I just don't want anything to be used against me. I'll talk to you off record." Special Agent Wendell quite properly explained that Medley could not talk with him "off the record because he invoked his rights." Medley again "consistently told [Wendell] that he wanted to talk to [him]."

In my opinion, just as a suspect's silence may be equivocal, his invocation of unspecified "rights," coupled with a course of conduct clearly indicating that he wishes to talk to police, may

reflect the suspect's indecision, ambivalence, or even calculation about whether to cooperate – as opposed to a clear understanding of his rights, and a clear invocation of his right to remain silent. See Midkiff, 250 Va. at 267-68, 462 S.E.2d at 115-16 (noting that statements such as "I'll be honest with you, I'm scared to say anything without talking to a lawyer," and "I don't got to answer that, Dick, you know," did not establish "a desire to cease all questioning"); see also Burket v. Commonwealth, 248 Va. 596, 610, 450 S.E.2d 124, 131-32 (1994) (holding no violation of Miranda where defendant stated "I just don't think that I should say anything" and "I need somebody that I can talk to," but elected to proceed with the interrogation and failed to exercise his right to terminate questioning); see also United States v. Johnson, 529 F.2d 581, 584 (8th Cir. 1976) (holding no reversible error in admitting statement where police failed to inquire further to determine if suspect's "seemingly contradictory" actions in refusing to sign a waiver but agreeing to answer questions "was the product of intelligence and understanding or of ignorance and confusion"); Works v. State, 362 N.E.2d 144, 152 (Ind. 1977) (DeBruler, J., dissenting) (noting that "[i]n refusing to sign the waiver and in indicating a willingness to speak, appellant was taking contradictory positions. Under such circumstances the police should have made further inquiry to determine whether appellant's decision to relinquish the right to remain silent was being made out of ignorance and confusion. Without such an inquiry, no conclusion could reasonably be reached that appellant had intelligently and voluntarily relinquished the right to remain silent.").

In my view, the facts here support the conclusion that police "scrupulously honored" Medley's right to remain silent. In fact, credible evidence in the record suggests that it was only because of Medley's conduct that police inquired further of Medley to determine whether he understood his right to remain silent, and/or was ambivalent as to whether to invoke it or to waive it.

Nevertheless, the parties – both below and on appeal – argue this issue in terms of

Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

> In order to "prevent police from badgering a defendant into waiving his previously asserted Miranda rights" and to "protect the suspect's 'desire to deal with the police only through counsel,'" the United States Supreme Court established the "Edwards rule" as a "second layer of prophylaxis for the Miranda right to counsel." See Davis [v. United States, 512 U.S. 452, 458 (1994)]; McNeil v. Wisconsin, 501 U.S. 171, 176, 178, 111 S. Ct. 2204, 2208, 2209, 115 L. Ed. 2d 158 (1991); Michigan v. Harvey, 494 U.S. 344, 350, 110 S. Ct. 1176, 1180, 108 L. Ed. 2d 293 (1990). Pursuant to Edwards and its progeny, once the defendant invokes his Miranda right to counsel, all police-initiated interrogation regarding any criminal investigation must cease unless the defendant's counsel is present at the time of questioning. See Minnick v. Mississippi, 498 U.S. 146, 153, 111 S. Ct. 486, 491, 112 L. Ed. 2d 489 (1990); Arizona v. Roberson, 486 U.S. 675, 683, 108 S. Ct. 2093, 2099, 100 L. Ed. 2d 704 (1988); Edwards, 451 U.S. at 484-85, 101 S. Ct. at 1885; see also Jackson v. Commonwealth, 14 Va. App. 414, 416, 417 S.E.2d 5, 6-7 (1992). If the police initiate interrogation of a defendant after he has invoked his Miranda right to counsel and before his counsel is present, "a valid waiver of this right cannot be established . . . even if he has been advised of his rights." Edwards, 451 U.S. at 484, 101 S. Ct. at 1884-85.

Quinn v. Commonwealth, 25 Va. App. 702, 710-11, 492 S.E.2d 470, 474-75 (1997).

> Whether the Edwards rule renders a statement inadmissible is determined by a three-part inquiry. First, the trial court "must determine whether the accused actually invoked his right to counsel" and whether the defendant remained in continuous custody from the time he or she invoked this right to the time of the statement. Second, if the accused has invoked his or her right to counsel and has remained in continuous custody, the statement is inadmissible unless the trial court finds that the statement was made at a meeting with the police that was initiated by the defendant or attended by his lawyer. Third, if the first two parts of the inquiry are met, the trial court may admit the statement if it determines that the defendant thereafter "knowingly and intelligently waived the right he had invoked."

Id. at 712, 492 S.E.2d at 475 (quoting Smith v. Illinois, 469 U.S. 91, 96 (1984)) (other citations

omitted).

- 44 -

In the case at bar, the trial court held "[Medley] didn't waive his rights; but he initiated the conversation. So I would overrule the motion [to suppress]." It is clear from the record that Medley did not, affirmatively or otherwise, unequivocally invoke his right to an attorney. Thus, an Edwards analysis was never triggered and was not appropriate then nor is such an analysis appropriate now. See Commonwealth v. Gregory, 263 Va. 134, 147, 557 S.E.2d 715, 723 (2002) ("The Edwards rule does not apply unless the prior interrogation was custodial and during that custodial interrogation, the suspect clearly and unequivocally invoked his right to counsel."). Indeed, the only question to be answered on this record is whether the police questioned Medley in violation of his Miranda rights.

The trial court specifically found that Medley did not waive his rights. While it is well settled that "[a] defendant's waiver of his Miranda rights is valid only if the waiver is made knowingly, voluntarily and intelligently . . . [and] [w]hether a statement is voluntary is ultimately a legal rather than factual question, [s]ubsidiary factual questions . . . are entitled to a presumption of correctness." Gray v. Commonwealth, 233 Va. 313, 324, 356 S.E.2d 157, 163 (1987) (citations omitted). Here, the trial court concluded factually that Medley "didn't waive his rights." Accordingly, contrary to the approach taken by the majority, there is no need to determine the legal issues of either the voluntariness of Medley's statement, or the applicability of Edwards. I therefore disagree with the majority's analysis concerning the police conduct at issue here, but I am bound to concur in its judgment because of the trial court's factual finding that Medley never explicitly or implicitly waived any of his rights under Miranda.